# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3852 | **DATE** | 2/2/2001 |
| **CASE TITLE** | Johnson Controls, Inc. vs. Exide Corp., et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Exide's motion to dismiss is granted in part and denied in part: Count I is dismissed because it is time-barred, while Count III adequately states a claim for tortious interference with prospective economic advantage. Exide is ordered to answer Count III on or before February 16, 2001.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | FEB - 5 2001 | | |
| | Notified counsel by telephone. | | date docketed | | 42 |
| | Docketing to mail notices. | | IS | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 2/2/2001 | | |
| | | | date mailed notice | | |
| SN | courtroom deputy's initials | | SN | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

DOCKETED

FEB - 5 2001

| | |
|---|---|
| JOHNSON CONTROLS, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 00 C 3852 |
| | ) |
| EXIDE CORPORATION, et al., | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

Johnson Controls, Inc. and Johnson Controls Battery Group, Inc. (collectively "Johnson Controls", treated hereafter as a singular noun) have asserted a number of claims against Exide Corporation ("Exide") and three of its former officers: Arthur Hawkins ("Hawkins"), Alan Gauthier ("Gauthier") and Douglas Pearson ("Pearson"). In brief, Johnson Controls charges defendants with having committed acts of commercial bribery in violation of (1) one provision (15 U.S.C. §13(c)) of the Robinson-Patman Act ("Act"),[1] (2) the Racketeer Influenced and Corrupt Organizations Act ("RICO," 18 U.S.C. §1962(c)) and (3) state common law.

Exide, which is targeted only under the Act (Count I) and the state law prohibition against tortious interference with

---

[1] All further references to the cited statute will take the form "Act §2(c)," using the Act's internal numbering rather than its Title 15 numbering.

42

prospective business opportunity (Count III),[2] has filed a Fed.
R. Civ. P. ("Rule") 12(b)(6) motion for its dismissal from this
action.  For the reasons set out in this opinion, Exide's motion
to dismiss is granted in part and denied in part.

## Rule 12(b)(6) Standard

For purposes of the current motion this Court accepts the
Complaint's well-pleaded factual allegations as true, while also
drawing all reasonable inferences in Johnson Controls' favor
(Sherwin Manor Nursing Ctr., Inc. v. McAuliffe, 37 F.3d 1216,
1219 (7th Cir. 1994)).  And under Rule 12(b)(6) no claim will be
dismissed unless "it is clear that no relief could be granted
under any set of facts that could be proved consistent with the
allegations" (Hishon v. King & Spalding, 467 U.S. 69, 73 (1984),
quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

## Facts[3]

Johnson Controls is a manufacturer and supplier of
automotive and specialty batteries (¶13).  Exide is one of its
competitors (¶86).  This action arises out of claims that several
of Exide's agents bribed Gary Marks ("Marks"), an agent of Sears,

---

[2]   Johnson Controls advances its Count II RICO claim against
the three individual defendants, not against Exide.

[3]   Because for Rule 12(b)(6) purposes this opinion must
credit Johnson Controls' allegations as true, what follows in the
Facts section is drawn from the Complaint (which is cited simply
"¶ --").  Hence the recital omits "Johnson Controls alleges" or
any comparable locution, although this Court has not of course
made any findings (as the caption Facts might otherwise suggest).

Roebuck & Co. ("Sears"), to procure a battery contract that Johnson Controls bid for but lost.

As of late 1993 Johnson Controls had a long-standing business arrangement as Sears' supplier of automotive and specialty batteries (¶17). In the years immediately preceding 1994 Johnson Controls had supplied 95% (pursuant to an October 1, 1988 contract) and then 100% (under a July 13, 1989 contract, the "1989 Agreement") of Sears' requirements for automotive batteries (¶¶21, 22). Then on September 7, 1993 Sears wrote Johnson Controls that it was terminating the 1989 Agreement effective September 30, 1994, as that agreement permitted (¶¶22, 23). Sears said in its letter that it wanted to renegotiate the terms of its battery supply contract but that it anticipated that it would "continue to purchase a significant quantity of batteries from Johnson Controls" (¶24).

In December 1993 Sears started a Strategic Sourcing Initiative, with the assistance of an outside consultant, to analyze its purchases and reduce expenditures "while increasing quality and forging closer and more efficient links with important suppliers and vendors" (¶25). Marks, who had assumed the title of "battery buyer" for Sears about May 1993 (¶26), was actively involved in the Strategic Sourcing Initiative and in selecting suppliers of automotive batteries for Sears for the period to begin October 1, 1994 (¶27). But Sears, in its pending

3

litigation with Exide in the Circuit Court of Cook County, Case
No. 99 L 10458, has expressly asserted in its Counterclaim ¶11:[4]

> As Battery Buyer, Marks lacked the authority to select
> battery vendors.

On February 10, 1994 Marks sent Johnson Controls a request-
for-quotation package asking for its bids on a number of supply
options for delivery starting in October 1994 (¶28). That
package listed Marks as Sears' contact person for the process of
bidding on Sears' battery supply contract (¶29). On February 28
Johnson Controls submitted a bid package seeking Sears' battery
supply contract (¶30).

Two other companies bid for Sears' battery supply contract:
Exide and AC Delco ("Delco"), both of whom submitted their bids
in February or March 1994 (¶33). Sears continued negotiations
with all three bidders--Johnson Controls, Exide and Delco--into
April 1994 (¶34). During those negotiations Marks criticized the
quality of Johnson Controls' product and marketing plans and
advocated Exide's selection to Sears' selection committee (¶35).
Then on April 21 Sears announced its decision to award
approximately 70% of its battery business to Exide and the
remaining 30% to Delco (¶36), effectively terminating the long-
standing Sears-Johnson Controls relationship (¶37). Sears'

---

[4]  Both sides' memoranda here have agreed that on the
present Rule 12(b)(6) motion this Court may take judicial notice
of that state court litigation and of what has been said by the
parties there.

4

announcement expressly stated that its battery sourcing decision did not reflect "any dissatisfaction" with the quality of Johnson Controls' products (¶38).

About the same time that Johnson Controls lost its bid for the Sears battery supply contract, it also lost business from Sears' Canadian affiliate ("Sears Canada"). Before 1994 Johnson Controls and Sears Canada had developed an excellent business relationship centered around Johnson Controls' supply of automotive and specialty batteries (¶39). Sears Canada had awarded Johnson Controls its annual Partners in Progress Awards in a number of those years, including 1993 (¶40).

During June 1994 Johnson Controls engaged in separate negotiations with representatives of Sears Canada regarding its sale of batteries (¶41). But it encountered strong resistance from Marks to its continued dealings with Sears Canada, and Marks said he wanted to award the Sears Canada business to Exide (¶42). On July 5 Sears Canada informed Johnson Controls that effective in October 1994 Exide would supply all of Sears Canada's automotive battery requirements (¶43).

Johnson Controls contends that Exide obtained Sears' business through illegal means. For the purposes of Exide's bid for Sears' supply contracts, Hawkins asked Exide employee Joseph Calio ("Calio") to become involved in the negotiations with Sears

"in early 1994" (¶44).[5]  During those negotiations Calio repeatedly met with Marks at Sears' offices in Hoffman Estates, Illinois (¶46).  And over the course of those visits Marks told Calio during their private conversations that Marks wanted Exide to pay him for influencing Sears to award the business to Exide (¶47).  Calio also learned during the course of the negotiations that Hawkins had led Marks to believe that he would be paid $20,000 per month if Exide obtained Sears' battery supply contract (¶48).

In September or October 1994 Exide began supplying batteries to Sears (¶49).  Then on November 30 Marks incorporated DG Consulting, Inc. in Illinois (¶50) to facilitate and conceal Marks' receipt of bribes from Exide (¶51).  And about March 1995 Exide (acting through Hawkins, Gauthier and Pearson) directed Calio to deliver a $10,000 cash payment to Marks (¶59).  Exide wire-transferred $10,000 into Calio's checking account (¶60), and in turn Calio, at Gauthier's direction (¶54), withdrew the money in increments and traveled to Illinois to deliver the money to Marks in cash (¶55).  Then in April 1995 Calio delivered another

---

[5]  It is painfully obvious that the Complaint's lack of specificity as to the timing of this and the other events referred to in this paragraph of the text has created an impermissible fuzziness as to the ultimate viability of both of Johnson Controls' claims.  After all, if Johnson Controls would not have retained Sears' business in any event, the conduct of Exide's people may have been improper but it would not have harmed Johnson Controls.  More on this subject later.

$10,000 to Marks (¶¶ 59-61).

After Calio expressed reservations about continuing to deliver the bribes to Marks (¶63), Gauthier told him that future payments to Marks would be made by wire transfer to DG Consulting (¶65). Exide made at least six payments of $10,000 each to DG Consulting between September 6, 1995 and January 31, 1996 (¶66). Exide's promises to pay and its payments of bribes to Marks were intended to increase the likelihood that Exide would obtain and retain Sears' business (¶68).[6] Those payments to Marks ceased when he was transferred to another position and was no longer Sears' battery buyer (¶69).

On March 2, 1999 Sears and Exide announced they had decided to end their business relationship (¶71). On September 7 of that year Exide sued Sears, seeking over $15 million in damages for the asserted breach of its battery supply contracts (¶72). On

---

[6] Sears Counterclaim ¶1 in its state court litigation with Exide (see n.4) alleges as to the illegal payments (emphasis added):

Exide and Marks intended through these payments to maintain and continue Exide's business relationship with Sears.

It will be remembered that under the 1999 Agreement Johnson Controls was Sears' only source of automotive batteries, so that Exide by definition had no existing business relationship with Sears through the duration of that Agreement (which ended September 30, 1994). When read literally, then, that assertion by Sears flat-out contradicts Johnson Controls' Complaint ¶ 68 allegation that the payments to Marks were intended to obtain as well as to retain Sears' business (a critical difference).

November 12 Sears filed a counterclaim alleging that Exide had paid $20,000 in bribes to Marks and had induced a breach of Marks' fiduciary duty to Sears (¶73). Just a week later the <u>Wall Street Journal</u> and newswire services published articles that discussed the Exide-Sears litigation, stating in part that Sears "accused Exide of making $20,000 in payments to the retailer's battery buyer over a 2-1/2 year period and receiving information about a contract" (¶74).

Johnson Controls first learned of Exide's bribes to Marks at the time of those publications--November 19, 1999 (¶75). Then on December 17, 1999 Exide filed an answer to Sears' counterclaim, revealing that it had made at least six additional payments of $10,000 each to Marks (¶76). Johnson Controls first learned of those additional bribes to Marks after December 17, 1999 (¶77).

<u>Johnson Controls' Act §2(c) Claim</u>

Exide has moved to dismiss Johnson Controls' claim under the Act on two grounds: (1) that the claim is time-barred and (2) that Johnson Controls' allegations do not meet the standing and antitrust injury requirements of Section 4 of the Clayton Act (15 U.S.C. §15). Because this Court finds that Count I is indeed time-barred, this opinion needs to address only the first of those contentions.

It should be noted initially that statute of limitations defenses are often inappropriate for resolution on a Rule

12(b)(6) motion to dismiss because their application most typically depends on factual determinations (<u>Kauthar SDN BHD v. Sternberg</u>, 149 F.3d 659, 669 (7th Cir. 1998)). If however a plaintiff alleges facts that show its action is barred by limitations, as is the case here, "it may plead itself out of court under a Rule 12(b)(6) analysis" (<u>id</u>. at 670).

Any plaintiff suing for a violation of Act §2(c) faces the four year statute of limitations prescribed by Clayton Act §4B (15 U.S.C. §15(b))(<u>Grand Rapids Plastics, Inc. v. Lakian</u>, 188 F.3d 401, 405 (6th Cir. 1999)). Under the Clayton Act, which provides for private actions stemming from antitrust violations, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business" (<u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 338 (1971), quoted and reconfirmed in <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 188 (1997)).[7] In the present context Johnson

---

[7] Throughout Johnson Controls' briefing of the subject, its counsel consistently muddies the waters by equating the accrual of an antitrust claim--and hence the commencement of the limitations period--with the time that the plaintiff <u>learns</u> of its injury at the hands of the defendant. But that focus on the plaintiff's knowledge, rather than on the <u>defendant's</u> commission of the antitrust-violative act that injures the plaintiff's business, flies in the face of the just-quoted doctrine announced in the seminal <u>Zenith Radio</u> decision and again reconfirmed 3-1/2 years ago in <u>Klehr</u>. As explained at length hereafter, the knowledge or lack of knowledge on plaintiff Johnson Controls' part may provide some relief from the endpoint of the statute of limitations, but it does not affect the commencement of the limitations period as such.

9

Controls' claim accrued not later than October 1, 1994, the date on which Exide began (and Johnson Controls ceased) to supply Sears with automotive batteries.[8] In those terms Johnson Controls' June 26, 2000 filing of the Complaint was well outside of the four year limitations period. Thus Johnson Controls' claim under the Act is time-barred unless the limitations period was sufficiently tolled.

Johnson Controls concedes as much, but it attempts to avoid the bar of the statute of limitations by invoking the doctrine of fraudulent concealment. Unfortunately neither party has provided a satisfactory account of the tolling doctrines that could potentially apply to the allegations contained in the Complaint under this Circuit's law.[9] That shortcoming in the parties' submissions has left this Court to its own devices in determining the extent to which the limitations period may be tolled in this

---

[8] It might alternatively be considered that the injuries to Johnson Controls' business took place earlier -- on April 21, 1994 when Sears announced that none of its battery business would go to Johnson Controls after its contract ran out on September 30, and on July 5, 1994 when the same decision was made by Sears Canada. This opinion will not resolve that question, instead making arguendo the assumption most favorable to Johnson Controls.

[9] Even though each party filed supplemental briefs on the statute of limitations issue, only two Seventh Circuit cases were cited in what collectively amounted to five submissions. Moreover, even the more recent of those two decisions--Trecker v. Scag, 679 F.2d 703, 708 (7th Cir. 1982)--is almost twenty years old. That deficiency on the part of counsel is astonishing as well as troubling, given the wealth of available authority that is examined hereafter in this opinion.

case.  With that stated, this opinion turns to a discussion of the tolling doctrines potentially applicable to the facts alleged in the Complaint.

There are two grounds on which a plaintiff can, after discovering that it has been injured, delay the running of the period of limitations:  equitable tolling and equitable estoppel (Martin v. Consultants & Adm'rs, Inc., 966 F.2d 1078, 1101 (7th Cir. 1992)(Posner, J., concurring), citing Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450-53 (7th Cir. 1990)).[10]

As for the first of those doctrines, Jackson v. Rockford Hous. Auth., 213 F.3d 389, 396 (7th Cir. 2000), quoting language from Cada repeated in Hentosh v. Herman M. Finch Univ. of Health Sciences/Chicago Med. Sch., 167 F.3d 1170, 1174 (7th Cir. 1999), teaches:

> Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim."

Any plaintiff that invokes equitable tolling to suspend the statute of limitations must bring suit within a reasonable time after it has obtained, or by due diligence it could have obtained, the information necessary to bring suit (Cada, 920 F.2d at 453).  Failure to do so will result in a finding that

---

[10]  Both equitable estoppel and equitable tolling are grafted onto federal statutes of limitations (Cada, 920 F.2d at 451).

plaintiff's claim is time-barred (id.).

In contrast, Jackson, 213 F.3d at 394, also quoting Hentosh,
167 F.3d at 1174, defines equitable estoppel in these terms
(other citations omitted):

> Equitable estoppel, also known as fraudulent
> concealment, is available if the defendant "takes
> active steps to prevent the plaintiff from suing in
> time."  Active steps triggering equitable estoppel
> include hiding evidence or promising not to plead the
> statute of limitations.  We have found equitable
> estoppel only where the defendant, in addition to
> committing the alleged wrong giving rise to the suit,
> has also tried to prevent the plaintiff from suing in
> time.

And as indicated by that explanation, such active steps to cover
up the wrongdoing must be distinct from the underlying wrongful
acts (Wolin v. Smith Barney Inc., 83 F.3d 847, 851-52 (7th Cir.
1996)).  Where a plaintiff successfully invokes equitable
estoppel it gets the full statutory period to sue, starting from
the time that it had enough information to bring suit (see also
Thelen v. Marc's Big Boy Corp., 64 F.3d 264, 267-68 (7th Cir.
1995)).

Because the consequences that flow from the two doctrines
are so different, and because they control the outcome in this
case, it is worth quoting at length from the comprehensive
treatment of the distinction in Wolin before turning to its
application to Johnson Controls' claim.  Here is the Wolin
exposition (83 F.3d at 851-52, with citations omitted and
emphasis added):

Fraudulent concealment, however, is distinct from a
fraud that is concealed. Otherwise the statute of
limitations would not start to run in a fraud case
until the fraud was exposed, even if the defendant had
made no effort to conceal it beyond what is implicit in
committing fraud and the plaintiff should have
discovered the fraud long before its public exposure.
But just how distinct from the original fraud the
fraudulent concealment must be has troubled the courts.
Some cases attempt a threefold distinction: between
the original fraud and fraudulent concealment and
within the category of fraudulent concealment between
"self-concealing" acts and acts of "active conceal-
ment." A self-concealing act is an act committed
during the course of the original fraud that has the
effect of concealing the fraud from its victims.
Active concealment refers to acts intended to conceal
the original fraud that are distinct from that original
fraud. The distinction corresponds to the more
conventional, but also, perhaps, more perspicuous,
distinction between equitable tolling and equitable
estoppel as grounds for extending the running of a
statute of limitations. Equitable tolling is invoked
when the prospective plaintiff simply does not have and
cannot with due diligence obtain information essential
to bringing a suit. It is easy to see how this might
happen in a fraud case, even if the prospective
defendant made no special effort to cover up the fraud;
unlike being hit over the head by a baseball bat
wielded by a known assailant, fraud is secretive by
nature. Equitable estoppel, as we have seen, is
invoked when the prospective defendant does make such a
special effort to cover up the fraud or does something
else to prevent the prospective plaintiff from suing in
time, such as promising not to plead the statute of
limitations as a defense.

Here Johnson Controls, seemingly heedless of the just-
described (and vital) distinction, attempts to invoke equitable
estoppel--so that it would be allowed four years to have filed
its complaint after, at the earliest, October 1998.[11] Johnson

_____

[11] Although Johnson Controls did not learn of the bribery
scheme until November of 1999, it states in its responsive Mem. 4

Controls has identified two sets of pleadings that purportedly support its contention: (1) Exide's own statements in related lawsuits, which supposedly establish that Exide fraudulently concealed Johnson Controls' claim, and (2) specific allegations in Johnson Controls' complaint against Exide. Those will be addressed in turn.

As for Exide's asserted admissions in other lawsuits, none of the pleadings identified by Johnson Controls goes any distance toward establishing that Exide fraudulently concealed information from Johnson Controls. Instead those submissions assert that the individual defendants fraudulently concealed information from Exide regarding their wrongdoing, most of which occurred in the context of their procurement of separation agreements from Exide in 1998. Where Exide portrays itself in the corporate entity sense as a victim of concealment by its own people,[12] it would turn the matter on its head to educe from that portrayal any

---

that from Exide's own characterization (in which it claims its own lack of culpability) the individual defendants' concealment was effective through October/November 1998. According to Johnson Controls, that would have been the earliest time when it could have known of the facts giving rise to its claim. Ultimately, however, whether the clock would have begun to tick in 1998 or 1999 is of no significance.

[12] This opinion should not be misunderstood as subscribing to that position, on which this Court of course expresses no view. It is rather that Exide's characterization must be accepted for purposes of evaluating Johnson Controls' effort to draw an impermissible inference from Exide's pleading to that effect.

implication that Exide had fraudulently concealed anything from Johnson Controls. So Johnson Controls' attempted resort to Exide's pleadings as a basis for invoking equitable estoppel in the present context is wholly without merit.

As for Johnson Controls' second proffered basis for invoking equitable estoppel, its Mem. 4 highlights these Complaint allegations:

> 1. To conceal the bribes, Exide wire-transferred money into Joseph Calio's account, and had Calio withdraw the money into two or more increments and hand-deliver the cash to mark in $100 bills (¶¶52-64).[13]

> 2. Marks incorporated DG Consulting "in an effort to facilitate and conceal" his receipt of bribes from Exide (¶¶ 50-51).

> 3. Exide made payments to DG Consulting to conceal the recipient's identity (¶¶65-66).[14]

> 4. Exide's offers to pay and its payment of bribes were kept secret from Sears, Marks' employer (¶67).

Although there is no question that those allegations reflect efforts by Exide (through the individual defendants) to conceal the bribery scheme, under the <u>Wolin</u> analysis they exemplify the proposition that "fraud is secretive by nature." And in terms of the <u>Wolin</u>-described dichotomy, the situation fits the emphasized portion of the earlier-quoted language like a glove. In short,

---

[13] As indicated by the Complaint, Exide made two of the payments to Marks in that manner (¶66).

[14] At least six of the payments to Marks were made in that manner (¶66).

equitable estoppel is out and (fully accepting Johnson Controls'
allegations) equitable tolling is in.

In that respect Complaint ¶75 asserts that Johnson Controls
did not learn of its claim until November 1999. At a minimum it
may reasonably be inferred that Johnson Controls was unaware--and
could not with due diligence have become aware--that it had a
claim until sometime in 1999. After all, Exide itself claims
that it was not aware of the bribery scheme until sometime during
1998, and the scheme apparently did not come to public light
until November 1999, when several media sources reported the
story (¶¶73,74).

That being so, the principle of equitable tolling gave
Johnson Controls only a reasonable time--not a brand-new
limitations period--within which to bring this lawsuit. It had
to file its Complaint as soon as reasonably possible once it had
the basic information needed to bring suit. Yet it took over
seven months (even on the best-case scenario) to file its
complaint after it had learned of the bribery: At the very
latest it had that information on November 19, 1999, and it did
not file this action until June 26, 2000.

That period of delay between Johnson Controls' acquisition
of knowledge that it had a potential claim and its institution of
this litigation is startlingly close to the time frame that our
Court of Appeals held to bar a claim in <u>Cada</u>. There the time

interval of eight months between plaintiff's discovery of the
necessary information and the normal expiration of the statute of
limitations was characterized as "huge in the circumstances" (920
F.2d at 453)--that is, as providing far more time than was needed
for plaintiff to launch its claim.  Although the delay here
occurred after the limitations period had already run, so that
the issue became how much new time should be allowed for suit to
be brought, the concept-how much time leeway is to be afforded a
plaintiff who has gotten the benefit of equitable tolling--is
identical.  By parity of reasoning, the unexplained delay of at
least seven months and a week bars Johnson Controls' claim, just
as the "huge" delay of eight months had barred Cada's claim.
Johnson Controls' Count I is dismissed.

### Johnson Controls' Tortious Interference Claim

Exide has also moved to dismiss Count III of Johnson
Controls' complaint, which targets Exide under state common law
for tortious interference with prospective business opportunity
or economic advantage.[15]  Even without the federal-question
underpinning that had been provided by now-dismissed Count I,
there are no jurisdictional obstacles facing Count III:
Diversity jurisdiction plainly exists under 28 U.S.C. §1332.

---

[15]   Because Exide's motion has not advanced a limitations
agreement as to that claim, so that the parties' memoranda have
not spoken to that issue, this opinion has not looked at that
question either.

On the latter score, Johnson Controls' ad damnum is far greater than the over-$75,000-amount-in-controversy floor. And as for diversity of citizenship, Johnson Controls is a Wisconsin corporation with its principal place of business in Wisconsin (¶5), while none of the defendants is a citizen of Wisconsin: Exide is a Delaware corporation with its principal place of business in Pennsylvania (¶6), Hawkins is a Michigan citizen (¶7), Gauthier is a New Jersey citizen (¶9) and Pearson is a Pennsylvania citizen (¶11). With the threshold jurisdictional issue settled, this opinion turns to the merits of Count III.

To prevail on a claim for tortious interference with a prospective economic advantage under Illinois law,[16] a plaintiff must prove (1) its reasonable expectation of entering into a valid business relationship, (2) defendant's knowledge of plaintiff's expectancy, (3) purposeful interference by defendant that prevents plaintiff's legitimate expectancy from ripening into a valid business relationship and (4) damages to plaintiff resulting from such interference (Dowd & Dowd v. Gleason, 181 Ill.2d 460, 483-84, 693 N.E.2d 358, 370 (1998), quoting

---

[16] Where as here the litigants in a diversity case fail to discuss choice-of-law issues, instead citing primarily to Illinois cases (even though the facts may involve some contacts with other states), the substantive law of the forum is presumed to provide the rules of decision (see, e.g., Wood v. Mid-Valley Inc., 942 F.2d 425, 426-27 (7th Cir. 1991), reconfirmed in Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, 136 F.3d 1116, 1120 (7th Cir. 1998)).

<u>Fellhauer v. City of Geneva</u>, 142 Ill.2d 495, 511, 568 N.E.2d 870, 878 (1991)).  Exide challenges the sufficiency of Johnson Controls' allegations regarding the first and third elements.

As to the first element, Exide contends that Johnson Controls has not and cannot adequately allege that it had a reasonable expectation of entering into a valid business relationship with Sears.  There is no question, however, as to the sufficiency of Johnson Controls' allegations in that respect.  Thus Complaint ¶ 98 states:

> When it bid for [Sears'] battery supply contract in 1994, Johnson Controls had a reasonable expectation of continuing its long-term business relationship with [Sears].

In addition, Johnson Controls has alleged:

1. It had done business with Sears for numerous years in the past (¶17).

2. In 1993 Sears stated that it anticipated that it would continue to purchase batteries from Johnson Controls (¶24).

3. Sears sent Johnson Controls a request-for-quotation package, making it one of only three companies that would bid on the battery supply contract (¶¶28,34).

4.  Sears negotiated with Johnson Controls in April 1994 -- the month that the supply contract was awarded (¶¶35-36).

Though not all of those things stand on the same footing in terms

of their probative force, in the aggregate they surely surmount the relatively low hurdle erected by Hishon.

Exide has cited several district court cases that found that particular plaintiffs lacked a reasonable expectation of entering into a future business relationship. All of those cases are readily distinguishable from the present situation and do not support dismissal here. Most significantly, Sears' statement of its own anticipation of some continued relationship with Johnson Controls, even while announcing its plans to embark on a bidding procedure, makes it reasonable to infer -- at least at this threshold stage -- that the thwarting of that anticipation interfered with Johnson Controls' reasonable expectation along the same line. That aspect of Exide's argument fails.

Exide's second challenge to the tortious interference claim is that Johnson Controls has failed to allege that its injury was actually caused by Exide's bribery of Marks. Although Johnson Controls need not assert that Exide's interference was the sole cause of its injury, as in every proximate cause situation it must show that Exide's actions were a causative factor (see Poulos v. Lutheran Soc. Servs. of Ill., Inc., 312 Ill. App. 3d 731, 745, 728 N.E.2d 547, 560 (1st Dist. 2000); accord, National Org. for Women, Inc. v. Seidler, 1997 WL 610782, at *22 (N.D. Ill. Sept. 23) (defendant's actions must be "a substantial factor

in, and thus the proximate cause"[17] of the plaintiff's injury in a claim of this type)).

Here Johnson Controls' allegations have amply met that standard when considered by themselves, for they have asserted both that the bribes "prevent[ed] Johnson Controls' legitimate expectation from ripening into a continuing business relationship with [Sears]" (¶100) and that "[a]s a result of the intentional interference by [defendants], Johnson Controls became severely disadvantaged in its negotiations with [Sears] and ultimately lost [Sears'] battery supply contract effective October 1, 1994" (¶101).

Exide responds by posing an interesting problem in Rule 12(b)(6) terms. Even though a court's scrutiny should ordinarily be limited to the complaint under attack, it is also true (for example) that judicial notice of matters outside of the complaint may be proper grist for the Rule 12(b)(6) mill. In this instance, as stated earlier, Exide points to Sears' statement in a related lawsuit that Exide's payments to Marks were intended to "maintain and continue" Exide's business relationship with Sears (E. Mem. App. 11) -- an assertion that is at odds with the notion that those payments had a causal nexus to

---

[17] Because the distinction often does not matter in a particular case, judicial opinions will frequently speak of "the proximate cause" rather than a "proximate cause" -- but the latter is clearly correct (see, e.g., IPI (Civil) 15.01 as well as Poulos).

Exide's _earlier_ acquisition of Sears' business during the bidding process (and hence to Johnson Controls' loss of its own business relationship with Sears).

Of course Sears is in a far better position, from its direct involvement in awarding its own battery business, to opine on that subject than is Johnson Controls from the outside looking in. But with the issue focusing on _Exide's_ intent in making the payments to Marks, Sears' perception must be viewed as evidentiary rather than dispositive (as Exide would have it). Hence for Rule 12(b)(6) purposes Sears' contradictory statement cannot trump Johnson Controls' Complaint allegations -- however conclusory they may be -- as a matter of law.

At bottom, then, Johnson Controls' causation contention is still breathing, though whether it will continue to have life after further proceedings remains to be seen.[18] Exide's argument on that subject fails at this preliminary stage.

Exide's final challenge to Count III is that Johnson Controls is required to plead and prove that Exide intended to interfere with Johnson Controls' economic advantage. Although

---

[18] Like any issue of intent, this one must be resolved from the objective evidence. So if for example it turns out that not only the payments to Marks but also the agreement to make such payments postdated Sears' award of its business to Exide, or that Marks did not indeed play a significant role in that award (something suggested by Sears' other statements that he lacked authority in that area), the conclusion reached here at the pleading stage could well be superseded.

Johnson Controls has in fact alleged such intentional interference (¶100), Exide argues essentially that Johnson Controls must make the further allegation that its interference was the main purpose of Exide's actions and not merely a side effect of Exide's attempt to obtain Sears' business. But the case law requires no more than a defendant's "purposeful interference that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship" (Dowd & Dowd, 181 Ill.2d at 484-85, 693 N.E.2d at 370). And "purposeful interference" connotes some impropriety in doing so (id. at 485, 693 N.E.2d at 371). Because Johnson Controls' allegations of Exide's commission of bribery thus suffice to assert "purposeful interference," Exide's third and final argument fails as well.

In sum, Count III facially states a claim for tortious interference with prospective economic advantage. That aspect of Johnson Control's Complaint survives.

## Conclusion

Exide's motion to dismiss is granted in part and denied in part: Count I is dismissed because it is time-barred, while Count III adequately states a claim for tortious interference

with prospective economic advantage.  Exide is ordered to answer
Count III on or before February 16, 2001.


_____
Milton I. Shadur
Senior United States District Judge

Date:   February 2, 2001